The only case on which we're hearing argument today at this time is 20-1508, Faculty, Alumni, and Students Opposed, etc. v. New York University. We'll hear from Mr. Mitchell. Thank you, Your Honors. Jonathan Mitchell on behalf of Appellant Bathsorb. May it please the Court. The plaintiff's complaint alleges facts that indisputably establish Article III standing, and each of these factual allegations must be assumed true when deciding a motion to dismiss. Paragraph 32 on page 30 of the appendix alleges all of the facts needed to show standing to challenge the Law Review's article selection practices. It explains that Bathsorb has members who have submitted articles to the Law Review in the past and who intend to continue submitting articles to the Law Review in the future, and it alleges that these members of Bathsorb will face discrimination on account of their race, sex, sexual orientation, and gender identity in the absence of judicial relief. Paragraph 43 alleges the necessary facts to challenge the Law Review's membership selection policies, and paragraph 45 contains the facts of established standing to challenge the law school's faculty hiring practices. All of these factual assertions must be assumed true at this stage of the litigation, and when the truth of these factual allegations is presumed, Bathsorb's standing is undeniable. The complaint says that its members' future injuries are certain, not speculative, and in all events, certainty is not required to be alleged in a pleading in order to establish standing. A substantial risk of future injury is enough. NYU's brief suggests that we're relying somehow on past injury to establish the risk of future injury, but that's not at all what we're doing. We do describe past injury alleged to individual members of Bathsorb, but that is done only to buttress the plausibility of our assertion that these individual faculty members will continue to submit their articles in the future because they have done so in the past. And most significantly, the factual allegations are actually supported by evidence, which we don't even need at this stage of the litigation, but which we've included in our complaint for good measure. NYU's own website admits that it uses diversity set-asides to select its members. That's right there on page 42 of the that the NYU Law Review solicits demographic information from its authors. We have the screenshot of Scholastica when authors submit their articles. They are specifically asked to identify their race and their sexual orientation and their gender identity when they submit their manuscripts to the Law Review for publication. And NYU's website boasts that it is committed to, quote, publishing scholarship written by authors from underrepresented backgrounds in the legal profession, end quote. That's right there on pages 43 and 44 of the appendix. Clearly, this is not a race-blind and sex-neutral article selection practice at the NYU Law Review. But none of this is even needed at this stage of the litigation. A factual allegation in the complaint is entitled to the presumption of truth. The evidence that we have attached shows that these factual allegations are at the very least plausible under the standard in Twombly and Iqbal, which unlocks the doors of discovery and allows the litigation to proceed. The federal rules establish a regime of no displeasing. That remains the case even after Twombly and Iqbal. And the level of factual detail that NYU is insisting upon and that the district court insisted upon in its opinion is simply not required by the federal rules or by any decision of the Supreme Court or this court. Twombly and Iqbal reaffirmed that, quote, detailed factual allegations are not required, end quote. The plaintiff in this case is not pleading fraud or mistake, which must be alleged with particularity under the special rules created in Rule 9b. But this court has specifically held that standing is not subject to a heightened pleading requirement and nothing other than fraud and mistake can be subjected to a regime in which the facts must be pleaded with detail and with particularity. The district court relied on Summers, the decision of the U.S. Supreme Court, that reversed a final judgment because a plaintiff had failed to prove with fact that the associational plaintiff had standing under the Supreme Court's doctrine in Hunt. The district court relied on Summers and so does NYU in its brief. But Summers has nothing to do with the standing. Summers concerns only the amount of proof that is required to support a final judgment for the plaintiff after discovery and after fact development. FASTFORK has also alleged a violation of federal law, not just standing but also a violation on the merits of Title VI and Title IX. This complaint specifically alleges that the law review discriminates on account of race and sex when selecting articles and when selecting its members. And the complaint specifically alleges that NYU Law School discriminates on account of race and sex in its faculty hiring. As with standing, these factual allegations must be true on a motion to dismiss. And the only way NYU can prevail on a Rule 12B6 motion at this stage of the litigation is to show that it is somehow per se lawful to use race and sex preferences in the way that the complaint describes. They cannot make that showing given the text of Title VI and the text of Title IX, even if one were to somehow assume that Grutter extends beyond the realm of student admission and covers faculty hiring and the selection of articles to be published in a law review. NYU does make an argument that rests on 42 U.S.C. section 2000B-3, which is a provision of Title VI that limits the ability of administrative and executive officers to bring enforcement actions against entities that accept federal funds and discriminate on account of race in employment. That statutory provision does not in any way curtail the ability of a private plaintiff to sue under the private right of action created by the courts to enforce Title VI. And it certainly has nothing to do with Title IX because this provision is not found in the Title IX statute. It also doesn't prevent the plaintiff, Fatsor, from using 42 U.S.C. section 1981 to challenge any racially discriminatory practices that might exist with respect to NYU's faculty hiring. All this is explained in the briefs. And if your honors have questions, I'm happy to yield the rest of my time to the court and open the floor for questions at this point. Thanks very much. Judge LaValle, any questions? No questions at this time. Thank you. Judge Menasci. Yeah, sure. So about the Summers question. So usually we think of jurisdictional limitations have to be established in accordance with the stage of the litigation. So at the end, you need to prove it. At summary judgment, you need to show that there's at least a question of material fact. And at the motion to dismiss stage, you need to allege it. So if you're conceding that at some point later, you will have to prove that there are individual members who are injured, why doesn't it just follow that you have to allege that to survive a motion to dismiss? We have alleged that there are individual members who are injured, Judge Menasci. That's right there on page 42, paragraph 42, I'm sorry, page 30 of the appendix. We don't identify them by name, but we're not required to name names in the pleading. We just simply have to say that these individuals exist, and that's exactly what we've done. And simply by alleging that there are individuals who've been injured, that is entitled to the presumption of truth at the Rule 12b6 stage, and nothing... So you're saying that's the same thing. That's not different than saying we have a particular member who's published some articles and plans to submit other articles in the future. Wouldn't that be different? Isn't that the basis on which the district court dismissed this complaint? The district court relied on Summers to say that we need to identify individual members, and it's hard for me to understand exactly what the district court was thinking with its reliance on Summers. Well, the district court said it's not deciding whether you need to use the actual name. You're just saying you need to identify an injured member with specific allegations. I mean, just B, we have this member who's been a law professor for seven years and has published five articles and intends to write another one in the next year that will be submitted to the NYU Law Review. Why couldn't you provide allegations like that? We don't need to go into that level of detail simply because we're not required to plead detailed factual allegations under Twombly and under ECBAL. But could you do that if it were required? We'd be capable of doing it for sure. I mean, if the district court wants to say... In Summers, the Supreme Court says we don't just accept an association's general description of its members' activities. We want the actual facts. Doesn't that suggest that those kinds of allegations would need to... I know they're not proved at the time of a motion but they would need to be provided as allegations. No, I don't believe that's right, Your Honor, because Rule 8 specifically says that these other facts, besides fraud and mistake, may be alleged generally. So it is perfectly permissible at the pleading stage to allege the relevant facts that will ultimately need to be proven in detail to prevail on a preponderance of the evidence standard. It is acceptable at the pleading stage to plead them with generality, even on the understanding that when the time for proof comes, there will need to be more factual detail than just... But you acknowledge that by the time the time for proof comes, you need to prove that there are these members who are publishing or submitting law review articles. Absolutely. All right. Can I ask you about the membership selection question? So this question about the injury, isn't it possible that the diversity selection policy might help somebody who's submitting an article? So if the diversity selection policy results in more student members who are interested in constitutional law, as opposed to, say, torts, and the person submitting an article is a con law scholar, wouldn't that make it more likely that their article would be accepted? Why is it necessarily... Or even that it would be a harm? Even if that were true, Judgment Ashy, there's still article three injury per se, and having the committee that selects the articles painted by racially discriminatory criteria. I think this follows just from powers against... Well, for the membership selection, the people who are, you're allegedly distributed on the are the students, but your members are not being discriminated against on the basis of race. Your members are just having, you allege, lower quality editing services and article selection services. It would be the same type of... I'm sorry. Yeah, go ahead. I'm sorry, Judge. Yes. It's the type of injury that's alleged in the jury selection cases where the criminal defendant can challenge the fact that his jury was selected pursuant to racially discriminatory criteria, even if it turns out that the racial discrimination wound up helping him in the jury pool in some way. It's certainly possible, for example, that the use of peremptory strikes on the basis of race might wind up helping the defendant or who knows. I mean, similar reasons that you described on how using racially discriminatory criteria on choosing the help an author if the person who winds up getting on the law review happens to like that person's article or finds it interesting or who knows. There can be, it's theoretically possible that that could... So you say you still have an injury in the idea that the article selection and article editing processes are kind of tainted by racial discrimination. Right. And you're right. I'm sorry. The members of FAFSA were not certainly the direct victims of that discrimination. In the same way with the jury selection context, the excluded juror is the direct victim of the racially discriminatory peremptory strike. But that doesn't mean that the criminal defendant who now is sitting in court and is now... I mean, what are the limits of that? I mean, understand in that case, a criminal defendant, there's a public interest in a fair process, but I'm not sure that there's such a public interest in the quality of editing. I mean, if I, as a reader of the NYU Law Review, think that it's lower quality because of their student retention policies, could I sue? Would I be injured? That's a harder question. That seems a little more attenuated, but these are some of the questions about Article III standing documents. When is an injury, in fact, too remote, too speculative, too attenuated? It is a question of degree. And I think Your Honor is right to point out, there will be some difficult questions at the margin. When you're talking about a reader, can he say that he's affected? The standard that we have from SCRAP is negative. But you just a moment ago said it's not obvious that even your clients who submit the articles are going to be negatively affected because it's conceivable they might be saying that it's a per se violation because it involves racial discrimination in the process. And so the reader is affected by the process. Everybody, like everybody down the chain is affected by the process. Right. With respect to Article III injury, but I should also be clear, Judge Menachie, Article III standing isn't enough by itself to get someone into court. I mean, there also has to be a cause of action. And what makes this case difficult with respect to the cause of action question is that the cause of action was inferred and created by the courts rather than in normal situations, there's a statute that actually defines who can sue. I understand. But even when we have an implied cause of action that's created by the courts, we still do a zone of interest analysis as to whether the person who's suing is among the people who are supposed to, like, intended to be protected by that statute, right? Prior to Lexmark, maybe that was the case. I don't think, Your Honor, after Lexmark, the courts can do this. It's a difficult question. Lexmark didn't address the question of court-created causes of action. What Lexmark says is that if we're looking for prudential standing limitation, we have to look to the statute that defines the cause of action and see who is authorized to sue by that statute to protect. That's easy to do. I mean, don't we have implied causes of action because it's the courts inferring that the created the statute would have wanted people to sue, or you're saying it's just a freestanding grief of the legislature? Yes, they're trying to... I mean, I'm sorry, of the court. Right. So if you're already imagining that the legislature wanted a cause of action, it doesn't take a lot of imagination to say you should also imagine who that legislature would have wanted to sue, does it? But it is an exercise in imagination, which just makes it very difficult to make a principled legal argument one way or the other. Can I just ask maybe just quickly, so if in fact there is a zone of interest requirement, are professors who submit articles within the zone of interest of Title VI or Title IX? It's such a hard question to answer when we don't have statutory language because the zone of interest, it's just a... I don't know how to answer that question without begging the question because when we ask what the zone of interest is, we need to look to the statute to say what the zone of interests are. It's a question that we look to the statute that defines the cause of action to tell us what the zone of interest is. At least that's what the Supreme Court said in Lexmark. So what I... Professor Curry's... All right, I... Yes, I'm sorry, go ahead. I'm sorry, go ahead. I want to hear what Professor Curry's article says what. Well, Professor Curry's article makes the same argument that Lexmark eventually endorses, and he made the argument about 24 years before Lexmark. But essentially the idea is that there are two possible ways to limit standing. One is Article III, the bare minimum requirement that the Constitution imposes. The second way you can limit a plaintiff's standing is to look to the statute that defines the cause of action. So that's where the prudential standing doctrines come from. I get it. I understand that. I want to... Go ahead. I'm just going to say, Your Honor, the problem here is that we don't have a statute that defines the cause of action. So there's no statute that limits the scope of who can sue in terms of the cause of action. So the only boundary that we really have comes from Article III and standing doctrines. And I think, as Your Honor knows, injury, in fact, is a very easy standard to meet. Would it go so far as to extend to the reader of the NYU Law Review? That's a closer question. But when it comes to the authors who actually are being judged by these students who are selected... But just to back up a second, the injury, you keep saying that the reader is too far removed, but you're saying that even the article author is not necessarily injured, that the whole problem is it's a per se injury because of the nature of the discrimination against the students. Oh, I'm sorry if I wasn't clear about that. It's a per se injury because the author is being judged by students who have been selected by racially discriminatory criteria. It's the same type of per se injury that the criminal defendant has in the jury selection context. All the courts have held that the criminal defendant has Article III standing to challenge a jury verdict if the jury was painted, the selection of the jury was painted by racially discriminatory criteria. That's a public process. I mean, why should we extend that to the people who are selected for a private university law journal? Because I don't see how the injury, in fact, would have any different application there because maybe going back to the criminal context, would a person who sits through and watches the trial have Article III standing because they watched the trial that was painted by a racially discriminatory jury? My guess is that the courts would probably say, no, that's too attenuated, that's too remote. Yes, you were affected perhaps in some way, but what you're really alleging is more of a psychological injury that normally doesn't... I think I understand. I think I understand that argument. I just wanted to ask about two other things. One is about the direct discrimination. Actually, it would extend to all of them. So the materials that you allege about NYU, the Law Review's diversity policy and the article selection policy, it describes the kind of holistic analysis. It doesn't describe a sort of direct discrimination. And so why... So doesn't that mean that the allegations are equally consistent with a kind of holistic analysis as versus a kind of a quota or a discriminatory approach? Our position, judgment, actually, is that any consideration of race or sex violates Title VI or Title IX, respectively. We don't believe grutter extends beyond the realm of university admission. So we're not talking about who gets into NYU. This is about membership on the Law Review. I see. So your position is even if it is a holistic analysis, if it takes into account race, then it's... That's correct. But also in the alternative judgment, actually, just to be clear, it's premature for the court at this stage to determine whether this truly is a holistic analysis that complies with grutter. There's no way to make that determination without factual development. Well, if we thought that a holistic analysis was permissible and also thought that your wouldn't that mean that you've only alleged that discrimination was merely possible and not plausible? Well, possible versus plausible, it's really hard to know where exactly that line is. My view of Twombly and Iqbal, and I know these are very opaque decisions, Twombly and Iqbal, which first of all, Twombly and Iqbal are very hard to reconcile with the presumption of truth, which is supposed to attach to every factual allegation. But what Twombly and Iqbal hold is that when you're basing your factual allegations on rank speculation, something that is totally unsupported by any evidence or any basis in reason, you can't just go on a fishing expedition and drag a defendant through three or four years of discovery just to find out if there's something there at the end. What we have to get over the plausibility threshold is NYU's own state on the law review's website. What we have is the screenshots where they're soliciting the demographic information. I get that. I have one last question, which is about 42 U.S.C. 2003. You do have an argument that the text of it suggested only applies to enforcement actions by government agency, but didn't our courts say in this case, association is discrimination in employment versus city of Bridgeport in 1981, that it applies also to private rights of action under Title VI? Yes, but the problem is, Judge Menasche, is the issue was not contested in the Bridgeport litigation. So the plaintiff in that case was content to concede the point, and that does not establish a precedent. I don't know. I mean, my recollection, I don't have it in front of me right now, but my recollection of the opinion is the court says there is an argument that it applies only to agency action, but we don't see why it would be so limited and decides that it's not so limited. Does that not accord with your recollection of the opinion? What I know the opinion said very clearly was the plaintiff did not contest the issue. So when a litigant is not going to lock horns with his adversary... Okay, now I get it. So you're saying we should understand it as dictating it wasn't contested. Exactly. And I think there's also a due process concern if we're going to be bound by a past decision of this court when a litigant chooses not to advance the argument that we're choosing to advance here. I mean, it's one thing, we're not a party to that case, but one thing, which I'm not going to so far as to say that stare decisis can never apply. But when you're trying to give precedential weight and say that an argument is closed to a present day litigant simply because some past litigant didn't make the argument that should have been made in a previous case, that does raise some due process concerns if you're going to say... I understand why we wouldn't regard the dictate as binding. I understand why that would be. Yeah. And also, Judge Menendez, we still have Title IX and we still have Section 1981. So even if we grant NYU everything about this argument based on the text of that statute, that does nothing to foreclose our efforts to use Section 1981 as a tool to go after NYU's faculty hiring practices. And it doesn't do anything to shut down Title IX either. Okay. All right. Thanks very much. Thank you, Judge. Thank you, Judge LaValle. Any questions? I wondered whether the Supreme Court's Swerkiewicz opinion plays a role in this. Well, I certainly think Swerkiewicz is still good law even after Tom Blanick falls. But at the same time, Judge LaValle, I'm reluctant to rely too heavily on Swerkiewicz just because it's not entirely clear whether the very broad language in that opinion can survive Tom Blanick's demand for something that they call plausibility. So I guess to answer your question, I would say Swerkiewicz certainly has not been overruled. It still is good law. I think it does state the general principle of no displeasing very elegantly and in a way that should inform court's decision-making. But it has to be read with, I think, an asterisk. And there's a caveat now with respect to Swerkiewicz, and that comes from Tom Blanick's fall, which if you're going to come into court armed with nothing more than rank speculation that the courts may throw a complaint out on 12B6, despite language in Swerkiewicz that seems to say you can never do that. Okay. Thank you. We'll hear from Ms. Lustig. Thank you. May it please the court, Tamar Lustig for NYU. Two district courts have dismissed faith-sourced claims for failure to allege standing. And they did so because of the conclusory, nonspecific allegations, even if accepted as true, don't meet the standard of cases like Summers and Lujan. Now, in this case, Judge Ramos gave faith-sourced a chance to allege further details about its purported members and their injuries, but faith-sourced refused to do that, even though it would have been easy if faith-sourced actually had members who faced imminent injury. Now, faith-sourced's deliberate decision to omit these facts can only be because it doesn't have injured members and no facts to allege about them. And courts are perjudicating real injuries to real injured parties. There are none alleged here. Instead, faith-sourced is trying to radically expand the doctrine of associational standing to eviscerate the case or controversy requirement of Article III. And if this court accepts that argument, the door would be opened to anyone with a generalized reason to dress a case up in the clothing of an organization and subject defendants to invasive discovery. And that is exactly what Article III standing requirements are meant to prevent. So the border below should be affirmed. Now, since the 12B1 issue is straightforward and it's dispositive, this court does not need to, and indeed cannot, address the 12B6 issue. So I will address standing first. Now, there are three fatal flaws with the standing allegations, which fail to allege any injury in fact to faith-sourced members. First, the members' hypothetical future contact with NYU is too speculative to support standing. Second, faith-sourced has no standing to bring claims arising out of the law review's membership selection process because it has no NYU student or alumni members. It turns out the faculty, student, and alumni in faith-sourced name is a total misnomer. The organization should be called Legal Scholars Against Diversity. And third, faith-sourced associational standing, it fails because it's failed to identify any injured members with standing. Now, the critical issue on this appeal is controlled by Lujan and Summers from the Supreme Court. And those cases reject standing for associational plaintiffs like faith-sourced. So take Summers, for example. An environmental organization wanted injunctive relief regarding regulations that would harm forests and then allegedly in turn harm its members that wanted to visit those forests. And the Supreme Court rejected the relevant forest. And intending or wanting to go there someday wasn't concrete or imminent injury that was relevant for declaratory and injunctive relief. And this complaint has precisely the same problem. For the student membership and article selection claims, all the complaint alleges in paragraph 42 and 43 that faith-sourced members intend one day to submit to the law review. And it's even more speculative for faculty hiring. This is in paragraph 45. Faith-sourced members might not even apply for jobs at NYU. Instead, they're simply waiting by the phone, remaining candidates, hoping that NYU will spontaneously reach out to them one day. And Summers and Lujan say that non-concrete Sunday plans like this are not injury. Now, there's no non-concrete future plans. It's wholly hypothetical. Now, I believe my colleague said you can rely on the past interactions with NYU to make those future intentions non-speculative. Well, the members of the organizations in Summers also alleged past interactions. They alleged past visits to the forest locations. But in that case, just like in this one, it wasn't enough because the future plans were entirely non-specific. You need something to tie those past plans to the future plans. Now, this court can and should resolve this appeal on the clearest and narrowest grounds possible, which is just by applying Summers and Lujan to the identical issues here. But there are a number of other deficiencies in faith-sourced complaints and this argument, and I'll try to cover a few of them now. So, faith-sourced lacks standing to challenge the law review's membership selection practices because it disavows third-party standing to seek relief for student discrimination, the individuals who actually participate in those practices. And bottom line, faith-sourced just couldn't find any NYU students who wanted to join this organization. So, faith-sourced tries to pivot by claiming that its faculty members have an injury from student membership selection practices. And that argument fails for several reasons, and I'll mention two of them now. The first is essentially a clapper problem. The harm to faith-sourced members from bad article editing, it depends on a totally speculative series of events occurring, that the articles will be submitted, that they'll be accepted and not withdrawn after publication in the Yale Law Journal, for example, that the staffers who are faith-sourced articles will be the ones chosen through the diversity process, that those diverse staffers are somehow worse editors, even though the selection processes described in the complaint have absolutely nothing to do with editing experience or proficiency, and that that will make some material difference to the faith-sourced articles. And the Supreme Court rejected what it called, like this, a highly attenuated chain of possibilities to support standing. Now, there are a number of other issues with the student membership selection claims, but the other one I'd like to mention is because faith-sourced rejects third-party standing, it can't allege a statutory violation either. Title VI and IX claimants are victims of discrimination. I mean, this court has said that repeatedly. For example, in Tolbert v. Queens College, a Title VI claim, one of the basic elements is that a plaintiff needs to show the defendant discriminated against him on the basis of race, and there's no allegation like that here. Faith-sourced members aren't alleged to be discriminated against in the student membership selection process, so there cannot be a claim for student membership selection. It's not alleged in this complaint. Now, the last standing issue is that faith-sourced fails to identify an injured member, and in this case, the Supreme Court has made this requirement clear, that there needs to be, there's a requirement of making specific allocations of an identified member or naming the affected members. That's the Supreme Court's language, and every circuit that has considered this question after the Summers decision has found that that rule applies on a motion to dismiss just like this one, and that makes a lot of sense because associational standing is essentially an exception to the rule that only the real party in interest can bring suit, and it's appropriately limited to where the association demonstrates that it has an actually identified injured member, meaning there's a real case for controversy. It's not a difficult requirement because the suing association has the burden to plead standing and facts about its own members available to it, but faith-sourced did not identify any injured members, perhaps because it doesn't have any, and that's exactly what the rule aims to prevent. Now, the district court correctly dismissed the complaint for lack of standing, and if this court upholds that decision as it should, it cannot and does not need to reach the failure to state a claim. So, each of, that said, each of faith-sourced theories of liability fail for very basic pleading omissions, and I don't have all the time in the world, so I'd like to just mention a few of them that apply to all of the claims here. So, first, faith-sourced theory of liability for all of these claims is that NYU and the Law Review discriminate against white men. Even if you assume that that is true for the sake of argument, the complaint doesn't allege that there are any white men in faith-sourced, so there is no alleged claim for discrimination against faith-sourced members. Second, the complaint fails to allege any facts that make plausible that NYU actually receives information through which to affect its purported discriminatory intent. The faculty submission form is entirely optional. The student membership collection process identifying your race or your And what the complaint omits entirely is any allegation that anyone in the history of time or a faith-sourced member has or would submit such information to the Law Review, and that is fatal to all of faith-sourced claims. All right, counsel, I'll hear from Judge LaValle if he has any questions for Ms. Lustig. Does the, if I understand correctly, the plaintiff here declined to submit an amended complaint. Is that correct? Yes, that's correct. That's on appendix page five. They were asked for a final judgment instead. And does that support, does that tend to support your argument that they didn't allege, they didn't include more specific allegations about their members because they seem not to have, not to be capable of it? That's exactly right. And that's what the associational standing cases and doctrines are meant to prevent. You need a real association with real injured members. And I think the only inference this court can draw from faith-sourced refusal to allege facts like that is that this is a purely academic interest for faith-sourced, and that's precisely what standing doctrine is meant to prevent. The lack of specificity in identifying affected members was one of the important grounds that district court relied on, so it would be a pretty obvious thing to amend the complaint to add that specificity if you have it, I would think. That's right. And just to be clear, Your Honor, the complaint that you have before you is already an amended complaint. I mean, we had a pre-Northern conference where we raised the very same issues. So if states had chosen to allege again, it would have been a second amended complaint. Um, fine. Judge Menasci, any questions? Yeah, so when you're talking about Lujan and Summers, you know, I understand when the court is considering allegations of upstanding to challenge environmental regulation, it was pretty clear that just being a member of an environmental organization didn't mean that you used a particular forest or a particular lake or saw particular wildlife, and so you needed more allegations. But when you're talking about law professors who submit articles to law journals, isn't it just the nature of that, that if you write law review articles, you're going to submit them to a whole lot of law journals? And it's just plausible that if that's something you do, it's going to be law review articles and submit them to law journals, including the NYU Law Review. Why isn't that enough? What more information do we need to know about the members to show that there's an actual harm? I think that the complaint that your honor is describing here isn't the complaint we have before us. And I encourage the court to go look at it because the complaint doesn't in fact allege faculty authors who regularly submit scholarship. That would have been easy to put in the complaint, but it's not there. What it says, and this is paragraphs 42 and 43, is that it has faculty or legal scholars, where legal scholars are apparently defined as someone who has once, at one point in the past, written a law review article. Now, so there's no... Well, okay, but I mean, but like obviously people who are not on law faculties still submit articles to law journals, so you're not saying that it has to be a law professor. I guess my question is, I understand that it's alleged generally that it says we have people who write law review articles and are going to submit a law review article to the NYU Law Review, but are you asking us when you say it should require allegations of the specific member, is that just a difference between them alleging we have members who submit articles on the one hand and on the other hand saying we have a particular member who is submitting an article? Like is that the only difference? What other information would they need to allege? So to answer that last question directly, what would need to be alleged in this complaint is a concrete plan about a specific article that will imminently be submitted to the law review, and that's what's missing here. It's the same thing that was missing in Summers, by the way. In that case, the members of the environmental organization submitted the affidavit saying we love visiting the forest, we do it all the time, we're going to do it in the future, and those plans weren't concrete enough. The someday when they would visit wasn't identified. So you're saying the allegations would have to be there is this particular law professor who's already working, or legal scholar, who's already submit to the NYU law review within the next six months, and that would be sufficient? It would certainly be a much closer call than this complaint, but just to respond to one more point. Well, I'm actually, I'm curious as to what would be sufficient. So why wouldn't that be sufficient? On this particular point, it likely would be sufficient, but I would like to address one other point your honor raised, which was the allegation of regularity. There is no allegation of regularity. What this complaint alleges is State Fair Press members who have submitted one article in the past. So we don't know if these people will ever write another article again. That's not in the complaint. Oh, I see. So you're just saying, you know, well, it does allege that they plan to do it in the future. I guess you're saying it's not plausible because we just don't know if they're really going to do it, or it's a general intention. Is that the point? That's exactly the point. But then in your brief, you say things like it doesn't describe the seniority of the faculty member or their area of scholarship or whatnot, but I think you just said that wouldn't be required. What's really required is just substantiating the concrete plan to submit the article. Well, those facts that we mentioned in our briefing would go to the faculty selection claim. So here there are no plans to even apply alleged in the complaint. Instead, they're just going to sit around and hope NYU calls one day. And what you need is some kind of facts about the faculty members that would put them even in the process where NYU allegedly discriminates. So I can imagine a hypothetical complaint alleging facts exactly like what you just mentioned. There's a particular member of Facebook who has a particular area of scholarship and NYU is looking for someone in that area. I get it. But I think it's clear from the affirmative action cases and other cases about public benefits or other things that you don't have to allege that you wouldn't have been hired by NYU. You just have to allege that you'd be subjected to a discriminatory process. So you're not saying that they would to allege that NYU would hire them, are you? No, I agree with your statement as well. Okay, but you're saying that there aren't even allegations that rise to the level, but why isn't it enough to say there is somebody who's interested in being a law professor and they're going to submit an application to NYU and it's going to be rejected because of race. Wouldn't that be sufficient? I guess your objection again is just that there's lack of concrete plan. Well, this complaint doesn't say that they're going to submit an application to NYU. This complaint says they hope NYU will reach out to them. And so there's nothing about these members. I mean, it's a generalized grievance. This is the essential problem. These members don't claim. Hold on a second. Judge Manasci, if you would let me break in. For sure, sure. Ms. Lustig, what is the law review's relationship with the law school in this particular action? I note that on the docket sheet, the descendant appellee is New York University. But further down, we have the New York University Law Review and the New York Law Review. And so they're not independent legal entities, Your Honor. The only legal entity capable of accepting process of service, the service of process here, excuse me, is the university itself. And you made much of the fact that this organization apparently do not have members who are NYU law students. Is that more or less what you said? Is that an accurate rendering of what you said? That is an admission that the plaintiff has made, yes. This is on the record, is it? Does that concede that none of its members are NYU law students? And on page 21 of the plaintiff's reply brief, footnote 17, the plaintiff specifically disclaims third-party standing to address student injury. And in paragraphs 42, 43, and 45 of the complaint, where Facebook identifies the members it does in fact have, it does not identify any NYU students or alumni. What it identifies is faculty members or legal scholars. All right. Judge LaValle, do you have any other questions? I have a- No more, thank you. Well, yes. I do. Hold on a second. Hold on a second. Let's see if Judge LaValle has any questions. No, no more, thank you. Okay. Judge Manasseh. Yeah, I have just a few more. So one is- I bet. Yeah. Your brief cites my dissent from Denial of Rehearing and Bonk in Crew versus Trump for the proposition that Summers applies on a motion to dismiss. Now, I don't know. I think I was right, but it was a dissent. So the point I was making in that case was that the panel did not seem to require the plaintiff in that case, an association of restaurants to identify a member that had been injured. I take it your position is that the panel would be wrong in that case. Is that right? Well, the panel didn't appear to consider the question, and I don't think that this court has ever considered that question, at least the majority has not, since the Summers decision came out. And we've cited a number of other circuits who have and have all determined that the Summers rule applies on a motion to dismiss. Conversely, I don't think they cited a single court that's considered that rule and found that it does not. Okay. The district court dismissed it not only because of the Summers rule, but also because it said that there was no legal entitlement to have your journal article edited by a higher quality student editor. But when we're talking about injury in fact, do you have to show that you're entitled to avoid what there's a legal entitlement? Isn't that more of a merits question? Don't we actually just ask whether the person has been harmed such that there's a concrete injury? That's right. I think that what that language is meant to address is to specifically respond to Staples' argument about the powers and other jury selection cases. And the reason that those issues. So in those cases, the descendant was found to have an injury in fact, because discrimination against the jury, it affected the fairness of the entire trial. And because the descendant has a legal entitlement to a fair trial, by extension, the descendant was harmed. So I think that legal entitlement language is meant to address those juries. Yeah, but what if we think that in fact, there is a harm, that they are getting lower quality editing services or whatever, but there isn't necessarily a legal entitlement to it. But wouldn't that still be an injury in fact? Like, isn't that still, there's a legal violation and it's harming somebody? Isn't that what's required for standing? In this case, there is. Say you assume that the injury of that editing is an injury in fact, you have to go through so many steps between Facebook members submitting their article to the law review, and that harm actually occurring. And each of those steps is entirely speculative, hypothetical. Oh, yeah, that's right. I understand. You're saying it's speculative, but that doesn't mean you need to have a legal entitlement to good editing. But if in fact, we didn't think it was speculative, if it just followed directly, it would be an injury. In fact, the problem that you're saying with it is that it's speculative, not that there isn't a law that entitles somebody to high quality editing. Yes. Okay. Why isn't it a reasonable inference to say that when you move from criteria based on academic performance to non-academic performance criteria, there's going to be a reduction in quality. You don't think that that is a reasonable inference to make, especially if we have to draw inferences in favor of the complainants? No, because there's no allegation or a complaint that either grades or the writing competition have any, they don't measure editing ability or editing performance. But even assuming that that's true, you still have all of these other steps that are speculative. I mean, you don't even know that the article would be accepted in the first place, for example. I guess I'm asking about a kind of a merits question. Well, yeah, okay. I guess you're right. It is relevant to the injury. So you're saying that there are other factors, but in general, just holding everything else equal, if you're moving from academic qualifications to non-academic qualifications, it's not possible to infer that that will lead to a reduction in quality? In the quality of editing? No, not in the academic merits themselves. It has absolutely nothing to do with editing, as far as the complaint says. All right. That's very helpful. Thank you. One more question. If they did allege to have NYU students among their members who hoped to be admitted to the law review, would that be sufficient? It would certainly be a much closer question. Understanding that would be sufficient. On the merits, you'd have a whole host of other questions about... We're not talking about the merits. We're talking about standing, right? On the standing question, that would be sufficient. If there were an actual NYU student who was a member of FACER, yes. But the merits are a whole other ball of wax. Thank you. All right. Mr. Mitchell has reserved three minutes, and maybe I can ask him, by way of preliminaries, tell us something about this organization of yours. I know you've covered that already on the record, but why is NYU the target of your affections? How is NYU different from all other universities with law schools? Or maybe that's not relevant. No, it's a fair question. What made NYU unique is that NYU's law review openly admitted on its website that it's engaging in racial considerations with respect to not only the selection of its members, but also the selection of its articles. NYU is one of the few law reviews that explicitly solicits the demographic information from authors. Let's hold it right there. Let's assume all of that to be accurate. What's wrong with that? Who cares? Isn't NYU a private institution that doesn't have to? I mean, I'm sure they have many journals which serve discreet or insular minorities. Is there something wrong with that? No, the problem with that, Your Honor, is that Title VI and Title IX require entities that receive federal funds to refrain from race and sex discrimination in all aspects of their operations. I've heard about that. Hold on a second. I've heard about that, but I still don't understand. Why is the NYU law review different from all other law reviews? That is, NYU has many law reviews of various levels of quality, and some of them may well be defined by either race or sex as the subject of greatest interest to its editors. I don't quite understand. Are you suggesting that any such journals would be painted in some way? Assume for the argument only that there is a Latino law review, which presumably would specialize in articles by, for, and about but if you don't care much for the language, you might say Latinx. So what's wrong with that? There's nothing wrong with having a journal that specializes in a certain subject matter. There is a right from the journal if the journal is discriminating in the selection of its members, and if they're discriminating in the selection of articles based on the race or... Hold it right there. The example I gave you was one in which it would indeed be, quote, discriminating, unquote, on the basis of identity or interest in matters relating to so-called Latinos, otherwise known as Hispanics. What exactly is wrong with that? What's wrong? And I'm sorry if I'm not understanding your honor's question. I know. I'm not understanding your argument either. I mean, you're very much preoccupied with the NYU Law Review, which is interesting. But this law school can, and many law schools have, law reviews which are devoted to the work, concerns, et cetera, of discreet or insular minorities. What is wrong with that? Your honor, there's nothing wrong with that. If you're talking about devotion to a certain subject matter, you can discriminate based on the topic of the article. No, no. Let's assume further. Most of these journals, as far as I've encountered them, the ones I'm talking about, very definitely are edited almost entirely by persons who identify themselves as Hispanic, and I think probably would not invite membership on this editors by persons other than Hispanics. What is wrong with that? It's a problem if they're excluding non-Hispanics. That's a problem, you say? It would be. But your honor, there may be selection effects in play. For example, if the reason that that hypothetical journal, or maybe it's an actual journal, but if the reason that this journal that you're describing is dominated by Latino students, because they're choosing to be on that journal and non-Latino students are opting for a different journal, there's nothing at all wrong with that. That's similar to just voluntary student groups. Most of the student groups at law schools, there's black law students, there's Latino law students, and the people who tend to join those organizations tend to match the racial identity of that group. Nothing wrong with that at all. But none of those groups can exclude white students from attending their meetings. And every law school has a policy that even if you are- We're not talking about meetings now. We're talking about, let's say, articles for the study of matters Jewish and Talmudic or rabbinical or whatever, and unlikely to draw a lot of attention from non-Jewish students. Anything wrong with that? There's nothing wrong with that. Because, I mean, first, I'm not aware of any federal statutes. I mean, they're not discriminating on the basis of religion if they're allowing non-Jewish authors to write about Jewish material. Maybe they decide they don't want to have non-Jewish. It seems a little awkward, but it's highly unlikely that a non-Jewish scholar would necessarily wish to delve deeply into matters Talmudic. So what if they take, as a threshold matter, they take their articles from persons who are both Jewish and interested in matters Jewish? I'm not following why this is a problem. It's only a problem if they're discriminating based on the race or sex of the author. They can discriminate based on the subject matter of the article. That's perfectly legal. And we're not accusing NYU of doing that. We're not complaining about the subject matter of the article, basically. What they can't do is have the authors who submit articles to the journal check off boxes that identify their race and their sexual orientation and their gender identity, and then use that criteria to decide whether or not an article will be published in the NYU Law Review. That's what we're challenging, nothing else. And I can't speak for the other journals at NYU because I haven't looked into what their practices are. We know what the NYU Law Review is doing because it's on their website. To answer your last question, that's what makes the NYU Law Review different from law reviews at other law schools and for other journals at NYU. Is everything the law review does attributable to NYU as an institution? Does the law review have a sort of special status? Or are you arguing that every student group, the policies of membership within every student group are attributable to the university that sponsors it? So it depends on how we define the program or activity that receives federal funds. NYU University is one entity legally, and the law review is operated by New York University. So the program or activity receiving federal funds is the university, and the law review is part of that program or activity. So yes, the short answer to your honest question, yes, what the law review does is attributable to NYU University, which is the entity that receives federal funds. What about student groups, non-law reviews? In many of these law schools, well after my own time in law school, organized on the basis of race or ethnicity, I can think of instances at the Yale Law School where the ethnicity of an Hispanic student who shows up for the Latino organization is questioned for some reason, where the authenticity of the student who shows up for the meeting is questioned by the others. Would something like that be a problem in your view? It depends on how involved the university is in recognizing or supporting the student group. It's certainly possible for a student group to have no official connection with the university. Once a student group is recognized by the university, and my understanding based on Christian Legal Society against Martinez, the Supreme Court case from 2010, is many universities both public and private, require the recognized student groups to abide by a non-discrimination policy that basically tracks the requirements of Title VI and Title IX, but even goes beyond that by saying that you can't discriminate based on religion. That was the issue in CLS against Martinez. The Supreme Court upheld that restriction as constitutional. Now, a student group can still exist without university recognition, and in that situation they can do whatever they want. It doesn't implicate Title VI or Title IX if they're not part of a program or activity that receives federal funds. The NYU Law Review is highly unlikely to receive any federal funds, right? Well, the students who leave the law school is highly unlikely to receive federal funds. Let's put that aside for a moment. The Law Review itself is highly unlikely to receive any federal funds. Isn't that right? Your Honor, NYU has not made this argument. The Law Review is somehow exempt from Title VI. I'm not interested whether they made the argument or not. I'm trying to make a living here. The way Title VI and Title IX have been construed by the courts, they've given a very broad interpretation of the definition of program or activity. So, if the Law Review is operated at the university, using university offices, having university-paid employees serve as support staff, that is part of the program or activity. And even if there's one portion of the university, somewhere else that's not even part of the law school that's getting federal funds, that's enough to trigger the requirements of Title VI and Title IX. That's been the law since, I believe, Grove City against Bell. If any portion of the university gets federal funds, the whole university is covered by Title VI and Title IX. Judge LaValle, did you have any questions for Mr. — Nothing further, thank you. Nothing further. Judge Menache. That's fine, thank you. All right. Thank you all very much. We appreciate the arguments and we'll take it under submission and I'll ask the clerk to adjourn court. Court stands to adjourn.